APPEAL OF ALFONS WILE.

Docket No. 5228. Promulgated May 28, 1927.

Section 214(a) (8) of the Revenue Act of 1918 does not authorize a deduction for obsolescence of good will.

*Ferdinand Tannenbaum, Esq.*, for the petitioner.
*Bruce A. Low, Esq.*, for the Commissioner.

The Commissioner determined a deficiency of $142.28 for the calendar year 1920. The petitioner was one of the partners of the firm of Julius Wile Sons & Co., and he claims that the March 1,

1913, value of the good will of that firm was $448,353.50. Petitioner claims that the useful value of the good will of the partnership was destroyed by prohibition legislation; that the usefulness of such good will was ascertainable on January 1, 1918, and that a deduction should be allowed for obsolescence thereof over the period January 1, 1918, to January 16, 1920, the latter date being the effective date of the Eighteenth Amendment to the Constitution of the United States prohibiting the manufacture and sale of intoxicating liquors for beverage purposes. The position of the taxpayer therefore is that for the year 1920 the Commissioner should have allowed a deduction for obsolescence under the provisions of section 214 (a) (8) of the Revenue Act of 1918, of an aliquot part of the March 1, 1913, value of the good will.

The Commissioner allowed no deduction for obsolescence of good will.

### FINDINGS OF FACT.

Petitioner is a resident of New York and since 1901 has been a member of the partnership of Julius Wile Sons & Co., which, during the period from 1887 to 1920, was engaged in the importation and sale of wines and liquors for beverage purposes. From the effective date of the Eighteenth Amendment to the Constitution of the United States prohibiting the importation and sale of intoxicating liquors for beverage purposes on January 16, 1920, the partnership of Julius Wile Sons & Co. has been engaged, and still is engaged, under the same name in the importation and sale of wines and liquors for non-beverage purposes.

Prior to January 16, 1920, the partnership " advertised and sent salesmen throughout the United States to secure business and also had a force of sales promotion representatives; men who went about from place to place where wines and liquors were used and sold and endeavored to promote the sale of the particular brands for which Julius Wile Sons & Co. were the United States agents." Among the brands of wines and liquors sold by the partnership were Burdon's sherry, Blanat brandy, Piper Heidesieck champagne, Cazalis and Prats vermuth brandy, Cunliffe, Dobson & Co. clarets and Sautermes de Muller's ports. These brands were carried and sold only by the partnership of Julius Wile Sons & Co. to wholesale liquor dealers.

Arthur B. Leffler, a member of a partnership known as John Leffler & Co. engaged as a wholesale dealer in liquors for beverage purposes, prior to January 16, 1920, purchased a large amount of the wines and liquors of the brands mentioned from Julius Wile Sons

& Co. to fill orders from customers calling for those brands. Subsequent to January 16, 1920, Leffler was engaged in the sale of liquors at wholesale for nonbeverage purposes under United States permit and continued to purchase wines and liquors from Julius Wile Sons & Co. Subsequent to January 16, 1920, the drug trade to which Leffler sold would order sherry, brandy, and the like without specifying whether they desired imported or domestic brands. Prior to the effective date of the Eighteenth Amendment Leffler employed salesmen to engage exclusively in the sale of wines and liquors to retail liquor dealers. Thereafter he employed new salesmen familiar with the drug sales, some of whom were also drug salesmen. Although Leffler received no specific demand for the particular brands of wines and liquors handled exclusively by Julius Wile Sons & Co. he continued to purchase from that firm by reason of his past relations and dealings with it and because of his friendship with persons connected with the partnership. From January 16, 1920, to the end of the year 1920 Leffler purchased wines and liquors from the partnership of Julius Wile Sons & Co. in the amount of approximately $5,000. During the year 1918 Leffler's purchases from Julius Wile Sons & Co. were between $20,000 and $25,000. For 1919 he was in business six months, during which time his purchases from this partnership were approximately $15,000. The three outstanding brands purchased by Leffler from Julius Wile Sons & Co. were Blanat˙ brandy, Burdon's sherry and Cazalis sherry. The margin of profit upon the liquors sold for beverage purposes was greater than the profit upon liquors sold for nonbeverage purposes. Leffler discontinued selling liquors for beverage purposes on June 30, 1919, and dismissed his salesmen. When operations were resumed under Government permit new salesmen familiar with the drug trade were employed. The compensation paid to salesmen prior and subsequent to January 16, 1920, consisted entirely of commissions upon liquors sold.

For thirty-three years prior to January, 1920, one Solomon Landsmann was engaged in dealing generally in imported wines at wholesale and retail, some of which were imported by himself and a portion purchased from other importers, among whom were Julius Wile Sons & Co. Among the spirits purchased from this partnership were Kote's wines, Cunliffe, Dobson & Co. clarets and Blanat wines, Piper Heidesieck champagne, Burdon's sherry, and Garner's cordials. Prior to January 16, 1920, Landsmann received numerous orders for these brands. During the period of his operations prior to January, 1920, Landsmann, after he had selected and decided upon the brands of wines and liquors that he desired to handle,

devoted himself to recommending and advertising those particular brands. There were many brands of imported wines and liquors upon the market but Landsmann, by reason of his friendly relations with certain individuals connected with Julius Wile Sons & Co., favored them in wines and in some cases handled their brands exclusively, particularly Piper Heidesieck champagne.

Subsequent to January 16, 1920, Landsmann has been engaged in the importation and sale of wine for sacramental purposes and has continued to purchase from Julius Wile Sons & Co., the number of purchases being fewer but the quantity of each purchase larger. Subsequent to January 16, 1920, Julius Wile Sons & Co. discontinued carrying certain brands of wines and liquors which it had theretofore handled. The profit upon the wines sold for sacramental purposes was smaller, and the number of sales were fewer, but the quantity of each sale was larger than during the period prior to January 16, 1920. The profits from this business by Landsmann during 1920 were in excess of the profits from sales for beverage purposes during 1918 and 1919. During 1920 Landsmann's purchases from Julius Wile Sons & Co. amounted to $50,000.

For twenty-two years prior to 1920 one Joseph Goldsmith had been in the employ of Julius Wile Sons & Co. as a salesman. The partnership sent Goldsmith to Spain in 1909, where he remained approximately six months making a study of the manufacture of different brands and grades of sherry and port wines. Thereafter he devoted his time to selling these brands and grades of wines in the United States for Julius Wile Sons & Co. Subsequent to the effective date of prohibition Goldsmith continued as a salesman for the partnership supplying wines and liquors to those holding permits to purchase. Subsequent to January 16, 1920, particular brands of wines and liquors were not so important as before, that is to say the demand that had theretofore been established for specific brands no longer existed as an element in the profitableness of the business of a particular dealer, to use the words of a witness " Persons holding permits to purchase just wanted something with a kick in it," and the success of a dealer depended largely upon his ability to influence the holder of a permit to purchase from him, as a result of good salesmanship, the grade of the merchandise offered on account of prior relations, friendship, reliability, and by reason of the price at which the spirits were offered.

Subsequent to January, 1920, persons and firms who had theretofore dealt with the partnership of Julius Wile Sons & Co. and who held Government permits continued to purchase from him, and many others who had not theretofore been in this business or who were

not regular customers of the partnership also purchased its merchandise in 1920 and subsequent years.

Prior to and subsequent to 1920 the partnership paid Goldsmith a salary and, in addition, a commission of from 5 to 10 per cent of the sales.

Since 1879 one Henry Dorn has been connected with the partnership of Julius Wile Sons & Co. and since 1895 he has been its principal salesman. He sold wines and liquors to hotels, restaurants, family liquor stores, and jobbers. In order to induce these various hotels, etc., to purchase the brands of liquors and wines sold by the partnership, Dorn would have friends of his call for these brands at hotels and restaurants, and when they were with other individuals and when ordering from jobbers. Dorn was well known to all persons dealing with the partnership of Julius Wile Sons & Co. In 1920 Dorn ceased soliciting purchases of wines and liquors. However, many persons and firms holding permits to purchase, having either known him in the past or who were advised by some one who had known him to purchase from Julius Wile Sons & Co., called upon him and made purchases of wines and liquors. In this way Dorn made sales during 1920 of approximately $200,000, which was greater than his sales during 1918 and 1919.

Alfred Freund, connected with the firm of Frank Kraus & Co., engaged as a wholesale dealer in wines and liquors for thirty years prior to January, 1920, purchased considerable quantities of wines and liquors from Julius Wile Sons & Co. and sold the same by brands to saloonkeepers and individuals. Purchasers of such spirits ordered by brands. Subsequent to January 16, 1920, this firm for a time sold liquor and wines to holders of Government permits. Specific brands were not so important after January, 1920, strong alcoholic content being the principal requirement. Frank Kraus & Co. continued to make purchases from Julius Wile Sons & Co. after the effective date of prohibition. This firm had been purchasing the brands sold by Julius Wile Sons & Co. for a period of about twenty-five years prior to 1920. By reason of restrictions and competition in the sale of intoxicating liquors for nonbeverage purposes, the firm of Frank Kraus & Co. discontinued business after about one year.

Julius Wile Sons & Co. was the exclusive American agent for certain imported wines and liquors and sold almost exclusively to wholesale wine and liquor dealers and to hotels and restaurants. Occasional sales were made to retail dealers. From January 16, 1920, the business of importing wines and liquors was continued by the partnership and such spirits were sold for nonbeverage purposes to those

holding United States permits, first, for medicinal; second, for sacramental; and third, for manufacturing purposes.

Prior to January and March, 1913, the partnership of Julius Wile Sons & Co. employed a number of men of acquaintance in this line to exploit and advertise the brands of wines and liquors sold by the partnership, in hotels, restaurants, clubs, railway dining cars, and political clubs. These particular men were not salesmen; they took no orders. They were paid stipulated sums for their services, and reimbursed for amounts spent by them in bringing the wines and liquors to the attention of others. These amounts were charged upon the books to an account styled " Piper Heidesieck expense account." The partnership also expended sums for advertising its various brands in catalogues or price lists of its customers, various public or private programs and occasionally through billboard and similar advertising methods, and charged such amounts to " advertising account." In 1919 the partnership had about 2,800 active accounts upon its books. After January 16, 1920, about 35 of these secured Government permits and continued to purchase wines and liquors from the partnership. During the year 1920 the partnership had fewer salesmen than in prior years.

Prior to January 16, 1920, 75 per cent of the partnership's trade consisted of wines and cordials and subsequent to that date 75 per cent of the sales consisted of Scotch whiskey and 25 per cent of wines. No cordials were sold after January 16, 1920, since importation was not permitted. Some of the brands of wines sold prior to January 16, 1920, were not handled thereafter. On January 16, 1920, the partnership discontinued purchasing certain brands of wines and liquors from some foreign manufacturers which it had theretofore represented in the United States and purchased other brands from other manufacturers at lower prices than it had theretofore been paying.

The partnership of Julius Wile Sons & Co. enjoyed large earnings almost constantly from 1879. During the period from 1903 to 1912 the net profits, and the capital and surplus of the partnership were as follows:

| Year | Net profits | Capital and surplus | Year | Net profits | Capital and surplus |
|---|---|---|---|---|---|
| 1903 | $25,937.79 | $91,180.54 | 1908 | $30,022.15 | $171,229.86 |
| 1904 | 27,444.82 | 111,261.39 | 1909 | 108,598.44 | 164,741.72 |
| 1905 | 29,228.93 | 127,470.33 | 1910 | 80,388.89 | 191,667.24 |
| 1906 | 31,352.08 | 135,040.78 | 1911 | 45,857.93 | 198,332.19 |
| 1907 | 44,222.06 | 145,867.34 | 1912 | 50,712.38 | 188,060.30 |

The gross sales and net profits before deducting interest on the capital and net profits after deducting interest on the capital for the calendar years 1913 to 1920, inclusive, were as follows:

| Year | Gross sales | Net profit before deducting interest on capital | Net profit after deducting interest on capital |
|------|-------------|------------------|------------------|
| 1913 | $699,423.50 | $36,083.30 | $28,831.29 |
| 1914 | 648,344.65 | 32,203.39 | 25,741.16 |
| 1915 | 492,247.68 | 23,317.89 | 17,494.65 |
| 1916 | 941,940.03 | 61,056.38 | 56,111.69 |
| 1917 | 1,093,404.38 | 25,682.67 | 16,859.10 |
| 1918 | 921,459.74 | 61,206.08 | 47,777.56 |
| 1919 | 812,323.09 | 21,449.35 | 5,249.35 |
| 1920 | 2,839,969.05 | 476,708.33 | 460,048.67 |

The advertising and promotion expenses for the years 1903 to 1920, inclusive, were as follows:

| Year | Advertising | Promotion | Year | Advertising | Promotion |
|------|-------------|-----------|------|-------------|-----------|
| 1903 | $307.90 | | 1912 | $145.46 | $15,522.66 |
| 1904 | 190.85 | | 1913 | 479.47 | 20,692.18 |
| 1905 | 267.33 | | 1914 | 29.63 | 13,384.63 |
| 1906 | | $3,004.07 | 1915 | 168.73 | 6,223.55 |
| 1907 | 44.46 | | 1916 | 105.43 | 14,473.69 |
| 1908 | 131.24 | 3,795.50 | 1917 | 106.90 | 29,562.73 |
| 1909 | 15.33 | 55,052.35 | 1918 | 103.40 | 21,852.84 |
| 1910 | 219.76 | 42,449.73 | 1919 | 342.11 | |
| 1911 | | 18,778.59 | 1920 | 87.50 | |

### OPINION.

LITTLETON: Whatever value the good will of Julius Wile Sons & Co. may have had on March 1, 1913, no deduction on account of destruction or obsolescence thereof due to prohibition legislation is allowable from gross income under the provisions of section 214 (a) (8) of the Revenue Act of 1918. *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626; *Manhattan Brewing Co.*, 6 B. T. A. 952; *Olt Bros. Brewing Co.*, 6 B. T. A. 974.

On the authority of those decisions the action of the Commissioner in refusing to allow this petitioner a deduction of any amount as obsolescence of the March 1, 1913, value of the good will of Julius Wile Sons & Co., a partnership for the calendar year 1920, is affirmed.

*Judgment will be entered for the Commissioner.*

SMITH not participating.